U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 NOV 19  PM 3: 49

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

TERESA GADE,                              )
                                          )
        Plaintiff,                        )
                                          )
    v.                                    )        Case No. 5:14-cv-00048
                                          )
STATE FARM MUTUAL AUTOMOBILE              )
INSURANCE COMPANY,                        )
                                          )
        Defendant.                        )

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION IN
LIMINE RE: PLAINTIFF'S PROFFERED BAD FAITH EXPERT WITNESS**
(Docs. 19, 98)

Plaintiff Teresa Gade brings this action against Defendant State Farm Mutual
Automobile Insurance Company ("State Farm"), her automobile insurance carrier, for
breach of contract and bad faith denial of insurance benefits arising out of motor vehicle
collisions Plaintiff was involved in on January 3, 2008 and May 21, 2009. Plaintiff's bad
faith claim arises out of State Farm's refusal to settle her uninsured motorist ("UM")
claim arising out of the 2008 collision.

Pending before the court is State Farm's motion for partial summary judgment,
wherein State Farm argues that Plaintiff cannot prevail on her bad faith claim because
State Farm had a reasonable basis to deny her 2008 UM claim. Plaintiff opposes the
motion. Also pending before the court is State Farm's Motion In Limine Re: Plaintiff's
Proffered Bad Faith Expert Witness. (Doc. 98.) State Farm asks the court to find that its
Motion for Partial Summary Judgment presents a question of law to be decided by the
court and to further find that an expert witness opinion on the issue of whether an insurer
has a reasonable basis to deny a claim is inadmissible. Plaintiff counters that the issue is
one of fact and contends that her expert witness offers admissible evidence that must be
considered in deciding whether partial summary judgment is appropriate.

Plaintiff is represented by Todd D. Schlossberg, Esq.  State Farm is represented by Richard H. Wadhams, Jr., Esq. and Robin O. Cooley, Esq.  The court held oral argument on this motion on September 26, 2014 and allowed additional discovery and briefing before ruling on the motion.[1]  The court took the motion under advisement on September 14, 2015.

## I.     The Undisputed Facts.

### A.     The 2008 Collision.

On January 3, 2008, Plaintiff, who was then forty years old, was involved in a motor vehicle collision in Winooski, Vermont, in which she was rear-ended by another driver who left the scene without providing his identification.  A State of Vermont Uniform Crash Report (the "2008 Crash Report") describes the circumstances of the 2008 collision as follows:

> On January 3, 2008, at approximately 1515 hours, I responded to the intersection of East Spring Street and Russell Street for a report of a motor vehicle crash.  Dispatch advised that one of the vehicles had fled the scene.

> Upon arrival I met with the operator of Vehicle #2, Gade.  She advised that she had stopped at the stop sign for Westbound traffic when she was hit from behind.  She went on to state that she got out of her vehicle and approached the vehicle that hit her.  She stated that the Unknown male asked her to move out of traffic and when she moved he fled the scene.

> Gade's only description of the operator and vehicle #2 is that it was a male operator and the vehicle was a dark colored van or truck.  Gade did not see the license plate and could provide no further information.

> Gade advised that she had a sore neck as a result of the crash.

> Gade was provided a State of Vermont Uniform Crash Report and was advised to complete a Vermont Accident Report.

> There are no suspects at this time for Operator #1.  No further action taken at this time.

---

[1] State Farm's motion was filed on June 18, 2014.  Plaintiff initially opposed the motion on the grounds that she needed to conduct certain discovery before she could properly oppose it. Pursuant to Fed. R. Civ. P. 56(d), the court agreed to allow Plaintiff to conduct discovery before filing her opposition to State Farm's motion.  Plaintiff's opposition was filed on August 31, 2015.

(Doc. 22-4 at 2.)

The 2008 Crash Report contains no information regarding the other vehicle. It indicates that Plaintiff suffered a non-incapacitating injury, the airbag in her vehicle did not deploy, and she did not need to be extracted from her vehicle. It further states that Plaintiff was wearing a shoulder and lap belt and that her estimated speed at the time of the collision was zero miles per hour. The 2008 Crash Report does not indicate whether Plaintiff's vehicle required towing.

The following day, on January 4, 2008, Plaintiff reported the 2008 collision to State Farm, who advised Plaintiff there was no deductible for her property damage. The estimate to repair Plaintiff's vehicle totaled $333.40 and indicated a repair of the vehicle's rear bumper and paint and finish to the affected area.[2] Plaintiff apparently chose not to have the vehicle repaired and subsequently sold it on September 14, 2009. Plaintiff did not advise State Farm of her personal injury claim resulting from the 2008 collision until after she consulted with legal counsel following the May 21, 2009 collision. She submits an affidavit in which she avers that, after the 2008 collision, State Farm did not inform her that she could bring a claim for UM benefits under her own policies for any physical injury she suffered.

## B.    Plaintiff's Medical History Before and After the 2008 Collision.

Prior to the 2008 collision, Plaintiff had a history of receiving treatment for neck and back pain and related symptoms.[3] On August 22, 2002, Plaintiff visited Fletcher

---

[2] Plaintiff disputes whether $333.40 represents the full amount of the property damage sustained by her vehicle as a result of the 2008 collision but proffers no evidence to the contrary. *See* Fed. R. Civ. P. 56(c) (requiring party opposing summary judgment to proffer admissible evidence to dispute fact characterized by moving party as undisputed); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'").

[3] Plaintiff filed a separate Statement of Additional Undisputed Facts primarily directed to her competing characterizations of her medical records. State Farm argues that the court should not consider this statement because it merely attempts to recharacterize the evidence and because a separate statement of undisputed facts is not authorized by the applicable rules. Pursuant to Vermont Local Rule 56(b), "[a] party opposing summary judgment . . . must provide a separate,

3

Allen Health Care for "'chronic neck problems'" and pain. (Doc. 19-8 at 1.) At the time, Plaintiff's treatment provider noted that Plaintiff had been experiencing increasing neck pain over the past six weeks and that Plaintiff rated her pain as a seven, presumably on a scale of one to ten.

On May 29, 2007, a MRI examination revealed Plaintiff had "[d]egenerative disc disease including an area of osteophytic ridging and diffusely bulging disc at C6-7 level, which creates right-sided more than left-sided foraminal narrowing and lateral recess stenosis and mild disc bulge C5-C6 level." (Doc. 19-9 at 1.) On May 31, 2007, Plaintiff reported that "she has . . . neck pain that is fairly constant." (Doc. 19-10 at 1.)

On July 10, 2007, Plaintiff met with Stanley E. Grzyb, M.D. for a spinal consultation. Dr. Grzyb recorded the presenting "[p]roblem" as "[n]eck pain" and noted Plaintiff "has had very extensive past medical history regarding her lumbar spine" and that "Dr. Monsey had to perform a series of procedures for her." (Doc. 97-3 at 1.) Plaintiff reported to Dr. Grzyb that she "has experienced cervical spine discomfort for at least the last twelve months[,]" "[s]he has a combination of both muscular discomfort and a deeper achy discomfort[,]" and that "she has had very occasional numbness of the little and ring fingers of each hand." *Id.* Plaintiff reported "no upper extremity pain." *Id.* Plaintiff advised that when she tried to do activities that she enjoyed "including sky diving and running, she will have increased discomfort. Likewise, during normal every day activities she will experience the achy discomfort in the neck." *Id.* Plaintiff noted that she "has occasionally used Advil or Aleve" and that "[w]hen the discomfort is more intense, she will use Ultram." *Id.*

concise statement of disputed material facts." "The rule thus does not authorize the filing of a statement of additional undisputed facts by the non-moving party." *Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 276 (D. Vt. 2013); *see also Post v. Killington, Ltd.*, 2010 WL 3323659, at *1 n.1 (D. Vt. May 17, 2010), *aff'd*, 424 F. App'x 27 (2d Cir. 2011) (striking a "statement of additional facts as unauthorized by the applicable rules"). However, the court may consider "additional facts [where] it is clear from the parties' briefing that those facts are both material and undisputed." *Rotman*, 955 F. Supp. 2d at 276. Here, the court will rely on the medical records themselves, rather than the parties' characterization of them. Accordingly, any disputed facts are not material. *See Liberty Lobby, Inc.*, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary will not be counted.").

Dr. Grzyb recorded that Plaintiff "has noted a crackling, crunching sensation in the neck with motion" and that she "has had chiropractic care which did not lead to resolution of her discomfort" although when her chiropractor applied manual traction, it was beneficial. *Id.* Dr. Grzyb reviewed Plaintiff's cervical spine MRI and noted that "[t]he most significant change is at the C6-7 level where she has modest degenerative change with a bulging disc and associated osteophyte formation which creates bilateral foraminal lateral recess narrowing, more on the right than on the left" although she was "not experiencing any C7 radicular symptoms at the present time." *Id.* Dr. Grzyb diagnosed Plaintiff as having "[c]ervical spondylosis[4] with primarily axial neck pain[,]" *id.* at 2, and agreed with Plaintiff's decision to pursue conservative treatment consisting of physical therapy and traction.

From October 27, 2004 until the 2008 collision, Plaintiff saw Sean Mahoney, D.C. for chiropractic care on eleven occasions. Dr. Mahoney's initial "analysis reveal[ed] areas [of] cervical, thoracic and lumbar fixation and subluxations[.]" (Doc. 97-5 at 1.) Plaintiff experienced significant back pain during the period in question and reported injuries sustained on two separate occasions when she was lifting her child, groceries, and ice and on a separate occasion when she passed out and fell in the bathroom. During this time frame, she reported neck pain as follows: on January 12, 2005, Plaintiff complained of "neck and upper back pain[;]" on May 20, 2005, she noted she suffered from "frequent neck pain and stiffness[;]" on October 25, 2005, she again reported "frequent neck pain[;]" on September 7, 2007, she reported "continued neck and dorsal pain which is frequent and ranging from 4-6 on 10 scale[;]" and on December 18, 2007, she sought treatment for "neck and upper back pain and stiffness and extreme limitation of cervical motion[.]" *Id.* at 1-3. Dr. Mahoney noted "bilateral lateral bending, bilateral rotation, extension and flexion[] . . . [are] reported to be quite painful and palpating

---

[4] "Cervical spondylosis, commonly called arthritis of the neck, is the medical term for . . . age-related, wear-and-tear changes that occur over time." *See* Doc. 97 at 2 (citing OrthoInfo, http://orthoinfo.aaos.org/topic.cfm?topic=A00369 (last visited Nov. 16, 2015)).

evokes a response of pain throughout the entire cervical spine and the dorsal spine to the thoracic four level." *Id.* at 3.

After the January 3, 2008 collision, Plaintiff saw Dr. Mahoney on January 15, 2008. She reported that she experienced "fairly severe-8 on 10 scale neck and upper back pain and spasm" and Dr. Mahoney observed that Plaintiff's "range of motion is very limited on lateral bending and rotation, extension and this is all reportedly quite painful." *Id.* Dr. Mahoney noted that Plaintiff responded well to the treatment he administered. His records do not indicate that Plaintiff reported that she had been involved in a motor vehicle collision. On January 18, 2008, Plaintiff saw Dr. Mahoney again and reported "continued severe neck pain averaging 8 on 10 scale with episodes of painful muscle spasm and very limited cervical range of motion." *Id.* at 3. Dr. Mahoney recorded that Plaintiff "did get a little bit of relief and is moving better than her last visit on the 15th." *Id.* His records do not mention the 2008 collision.

On January 22, 2008, Plaintiff saw Dr. Mahoney and "relat[ed] that her neck and upper back pain is doing very poorly and she rates this at a pretty strong eight on 10 scale today with a severe restricted cervical motion, muscle splinting and tenderness and also indicates pain radiating down into the left lower lumbar." (Doc. 97-5 at 5.) Dr. Mahoney's notes record that Plaintiff "does have a pre-existing disc bulge-herniation in the cervical spine and I indicated to her that this accident could well have aggravated that level of disc herniation and in fact caused a secondary area to be involved." *Id.* This is the first mention of the 2008 collision in Plaintiff's medical records.[5]

On February 13, 2008, Plaintiff visited Dr. Grzyb for a follow-up visit for "[a]xial neck pain and right upper extremity paresthesias." (Doc. 97-6 at 1.) He noted that since he last saw Plaintiff, she had "followed a conservative treatment program with physical therapy, traction and was doing much better." *Id.* Dr. Grzyb recorded Plaintiff's description of the 2008 collision and the symptoms she suffered thereafter as follows:

---

[5] As State Farm observes, Plaintiff has produced three different versions of Dr. Mahoney's notes for the January 22, 2008 visit. (Doc. 100-1 at 20-21, ¶ 30, Exhibit HH thereto.)

> She indicates that she was involved in an automobile accident on January
> [3], 2008. She was the driver of her vehicle and she indicates that she was
> struck from behind. She pulled over at the request of the driver who struck
> her and the driver continued on so she has no idea who caused the accident.
> She indicates that thereafter she experienced increasing neck pain as well as
> paresthesias in the right upper extremity. The paresthesias have involved
> the middle, ring and long fingers and also have involved the thumb and
> index fingers. She indicates that the paresthesias involving the little and
> ring fingers increase with flexion and extension activities of the cervical
> spine. She has worked with a chiropractic physician, Dr. Sean Mahoney,
> but this has not led to resolution of her discomfort. She has also tried
> traction, but the traction definitely increased her symptoms, specifically
> leaning to increase a sense of paresthesia in the right thumb and index
> finger.

*Id.* Dr. Grzyb reviewed lateral x-rays of Plaintiff's cervical spine taken within the

previous two weeks and noted that "the degenerative change at C6-7 with disk space

narrowing at that level" was "similar to the MRI that was done last year." *Id.* Dr.

Grzyb's assessment was "[a]xial neck pain, cervical spondylosis, right upper extremity

symptoms that may be related to cervical radicular symptoms/thoracic outlet

syndrome/cubital tunnel syndrome/ambiguous carpal tunnel syndrome." *Id.* He advised

Plaintiff that she could pursue further evaluation through a repeat MRI.

On February 29, 2008, Plaintiff reported to Dr. Mahoney that her pain level was

"just a little bit lower" and that she had been to a neurologist for testing who had

diagnosed thoracic outlet syndrome. (Doc. 97-5 at 7.) Plaintiff advised that she thought

she was suffering from a "cervical disc related issue" and Dr. Mahoney noted that he was

"completely in accord with her evaluation of this situation based on her objective testing

results, her past history and the mechanism of injury with the recent motor vehicle

accident." *Id.* Plaintiff visited Dr. Mahoney fourteen times after the 2008 collision and

prior to the 2009 collision without reporting significant or sustained improvement in her

neck and back symptoms.

On February 28, 2008, Plaintiff visited Thomas J. Zweber, M.D. for an

electrodiagnostic medicine consultation. Dr. Zweber described Plaintiff's "somewhat

complicated history relating to her spine" as including a "fracture of her lumber spine

7

approximately 10 years ago" and "[i]n the summer 2007, she began to have significant
neck pain [and] had an evaluation showing some spinalDJD and disk disease." (Doc. 97-
7 at 1.) He noted that Plaintiff advised that she was "doing quite well" until the 2008
collision, which she described as follows:

> In January 2008, she was rear ended by another car going perhaps 10
> mile[s] per hour. She felt sudden immediate increased pain in her neck
> down into her right and left arms. Since then she has been having frequent
> numbness into her fourth and fifth fingers on her right greater than left
> hand. Ongoing neck pain and she states that she is quite bothered by this.
> It is affecting any of her physical activities where previously she was quite
> active athletically and at home.

*Id.* Dr. Zweber performed a nerve conduction study and an MRI and recorded the
following impressions based on "an abnormal EMG/Nerve Conduction Study[:]"

> 1.   Patient has mild to moderate right cubital tunnel syndrome.
> 2.   She has mild to moderate left cubital tunnel syndrome.
> 3.   She also appears to have bilateral mild thoracic outlet syndrome.
> 4.   Despite some clinical suspicion for cervical radiculopathy, I was
>      unable to document cervical radiculopathy, although with peripheral
>      nerve irritability and entrapment it makes the diagnosis more
>      difficult.

*Id.* at 3.

On March 5, 2008, Plaintiff received a second MRI evaluation, which revealed
"bilateral neural foraminal stenosis right greater than left" on the C6-C7 level. (Doc. 19-
14 at 1.) Heather Burbank reviewed the MRIs and opined that Plaintiff's condition was
"unchanged from prior study" [Plaintiff's May 29, 2007 MRI] and her C6-C7 level
"[d]oes not appear significantly changed from the prior study." *Id.*

On April 24, 2008, Plaintiff received treatment from Jerry Tarver, M.D. of the
Vermont Interventional Spine Center. Dr. Tarver noted that Plaintiff presented "with a 4-
month history of increased right neck pain with radiation of pain and numbness down her
right arm into her second through fifth fingers" and reported that her symptoms began
after a low-speed motor vehicle accident in which she was rear ended and that she had "a
long history of chronic neck pain and generally very manageable." (Doc. 97-8 at 1.) He
further noted that Plaintiff had a history of lumbar spine problems which included

8

"persistent chronic low back pain" and surgery in 1995, 2000, and 2001. *Id.* Dr. Tarver
recorded that a cervical MRI revealed "changes [that] are reportedly no different from a
previous cervical MRI from the year before." *Id.* Dr. Tarver assessed cervical
spondylosis and gave Plaintiff an injection of Isovue-200, Lidocaine, and
Dexamethasone. On May 15, 2008, Plaintiff saw Dr. Tarver again and reported "very
minimal relief" from the steroid injections and no significant cessation of the symptoms
she was experiencing in her fingers. (Doc. 97-9 at 1.) Dr. Tarver administered another
steroid injection which also failed to provide any significant relief.

On July 29, 2008, Plaintiff was evaluated by Robert D. Monsey, M.D. of the Spine
Institute of New England. Dr. Monsey recorded the following in the "[s]ubjective"
portion of his evaluation:

> The patient is a 41-year-old woman who began experiencing neck
> discomfort with no specific traumatic event in 2007 with some neck pain
> with occasional numbness in her small and ring finger of each hand. She
> had chiropractic care which did not lead to resolution of her discomfort.
> She used anti-inflammatories. She saw Dr. Grzyb and was started on a
> course of physical therapy and traction and had complete relief of her
> symptoms until a motor vehicle accident in January when she was struck
> from behind. Following that she has had increased neck pain and arm
> symptoms, which have gotten progressively worse. She describes the pain
> in the neck center and on the right paraspinal region with discomfort along
> the shoulder with a numbness and tingling that extends along the lateral
> brachium, dorsoradial forearm[]and into the ulnar border as well as the
> radial border of the hand with tingling in either the ulnar two digits or radial
> three digits depending on how she moves her neck. She notes the neck pain
> tends to be constant, worsened with activity. The arm symptoms tend to be
> there to some degree, but are worsened particularly by motion of her neck
> and any particular motion in the way she moves her neck will predict where
> the pain into the arm will go. She was treated with traction and physical
> therapy, again both of which made her more sore and treated with anti-
> inflammatories without significant relief. She underwent epidural
> injections with no change in her symptoms. She has had acupuncture with
> no relief. She feels that these current symptoms significantly impair her
> quality of life and comes in today to discuss potential options for treatment
> of that.
>
> In addition, she describes several months of left-sided lumbosacral flank
> numbness that occurs if she sits or is in one position for too long a period of

time, occasional "insect bite" feelings involving her leg in different distributions with no specific motion or action that precipitates those. She notes those are quite transient and intermittent.

(Doc. 97-11 at 1.) Dr. Monsey opined that Plaintiff's symptoms were "consistent with a radiculopathy in the setting of electrophysiologic evidence of peripheral compressive neuropathies and concordant radiographs" and that "the natural history which is one of a waxing and waning course, but progressive improvement over an unpredictable time period." *Id.* at 2. He discussed treatment options, including additional medication and surgery and opined that surgery offered "a 90% chance of good relief of symptoms." *Id.*

On September 29, 2008, Plaintiff underwent a C6-7 anterior cervical disketomy and fusion, anterior structural allograft, and anterior Synthes plate. On November 4, 2008, at a follow up visit, Dr. Monsey described Plaintiff as "doing well" with "complete relief of her preoperative neck and arm pain" and noted that she was "making excellent symptomatic and functional gains." (Doc. 19-16 at 1.)

Plaintiff asserts that her medical bills related to the January 2008 collision total $51,249.48 and that she lost income in the amount of $51,249.48 following her September 29, 2008 surgery.

### C.    The 2009 Collision.

On May 21, 2009, Plaintiff was involved in a second motor vehicle collision. She alleges that George Snide pulled out of his driveway and struck her vehicle, causing her to suffer a spinal injury. With State Farm's permission, Mr. Snide's insurer settled with Plaintiff for $100,000, the limits of his policy. Plaintiff submitted a claim for underinsured motorist benefits, which State Farm denied. In this lawsuit, Plaintiff asserts a breach of contract claim against State Farm arising from its denial of underinsured motorist coverage for the 2009 collision.

### D.    State Farm's Denial of Plaintiff's 2008 UM Claim.

On October 5, 2010, Plaintiff's counsel requested copies of the declaration pages for all State Farm policies that were in effect at the time of Plaintiff's 2008 collision and asked State Farm to confirm the total combined available UM coverage. Each of State

Farm's policies at issue provides: "We will pay damages for bodily injury or property damage an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle." (Doc. 19-1 at 3, ¶ 8.)  State Farm responded by letter dated October 19, 2010 and advised that it was reviewing the potential coverage.  On October 28, 2010, State Farm advised that there were two policies in effect at the time of the 2008 collision and that certified copies of the Declarations Pages had been requested.  On November 9, 2010, State Farm sent Plaintiff's counsel the requested Declarations Pages for two policies.  State Farm subsequently sent Plaintiff's counsel certified copies of three auto policies.

At the request of State Farm, on June 10, 2011, Plaintiff submitted to an Examination Under Oath wherein she averred that prior to the 2008 collision, she had "a sore neck" that she went to the doctor for in 2007 that was "low grade" and which was "resolved" through physical therapy and a home traction device. (Doc. 97-1 at 18-19.) She declared that although she "may have had a flair-up or two" her neck pain was otherwise "forgettable in between" by which Plaintiff meant that she had some symptoms but they "weren't so bad" and she "wouldn't necessarily think about them." *Id.* at 19-20. She further stated under oath that she "had neck pain right after the accident" and that the pain "going down [her] arm right after the accident" occurred "[w]ithin a few weeks" and continued to worsen thereafter until she had surgery. *Id.* at 21-22.  Although she was able to work during this time period, she ceased doing "extra-curricular exercise, fun and family activities" and was not able to do "a lot of the normal routines around the house: Laundry, housework, things like that." *Id.* at 22.

State Farm acknowledges that a claimant's credibility is taken into consideration in determining whether to pay a claim.  On July 18, 2011, it advised Plaintiff's counsel that it had reviewed the records and Examination Under Oath summary provided by the defense and stated that it would be best to obtain films from Plaintiff's MRIs performed on May 29, 2007 and in March 2008.

On August 4, 2011, after discussions with Plaintiff's counsel, State Farm's claims representative, Armando Bermudez, wrote Plaintiff's counsel, advising that State Farm

11

was "currently having this claim reviewed by an Independent Physician and a Biomechanical Expert[,]" (Doc. 97-27 at 1), and by a separate letter on the same date advised:

> We have reviewed the Examination Under Oath and the medical records provided. Based on what we have, we feel that we have causation issues regarding the injuries alleged in this matter. Your client was treating for cervical issues almost up to the date of loss. She saw the chiropractor three weeks before the accident.
>
> Because this impact was so minor, we feel that this accident did not aggravate your client's condition, so we will not be making any voluntary payments for your client's [2008 UM] claim.

(Doc. 19-24 at 1.)

On October 19, 2011, Plaintiff's counsel asked State Farm to confirm in writing the total available UM coverage. On November 16, 2011, State Farm advised that it was treating Plaintiff's claim as a UM claim under two applicable policies, both with "100,000.00 per person/300,000.00 per accident" limits. (Doc. 19-26 at 1.) By letters dated November 17 and November 21, 2011, Plaintiff's counsel again asked State Farm to confirm the total UM coverage.

Plaintiff subsequently requested that State Farm pay UM benefits for her personal injuries sustained as result of the 2008 collision. By letter dated October 19, 2011, she confirmed that she was asking State Farm to pay the "available UM coverage limits." (Doc. 19-25 at 1.) State Farm responded by letter dated November 16, 2011, advising that:

> The damages presented are unclear as being related to this loss. This was a minor accident, the damage to your client's vehicle was $333.40. The question is—was there enough force to cause an injury? Was there a need for surgery because of the accident? Your office did not provide any records in regards to the MRIs done prior to this accident due to similar complaints she had.
>
> MRIs were done in the late spring and summer of 2007, due to bilateral hand parasthesias. Your office did not provide us any records from the doctors that ordered the MRIs, or any follow up to discuss the results. Can your office provide us with those records?

12

(Doc. 19-26 at 1.)  By letter dated November 17, 2011, Plaintiff's counsel again requested payment of UM benefits and asserted that State Farm had not "articulated any basis for denying payment of benefits, or provided any grounds for disputing the medical evidence[.]"  (Doc. 19-27 at 1.)  Plaintiff's counsel further asserted that "Ms. Gade has provided you with her pre-collision and post-collision medical records."  *Id.*

On November 18, 2011, State Farm wrote Plaintiff's counsel and stated:

> We have reviewed the medical records again.  We have some serious causation concerns with this claim.  We cannot at this time make any offers of settlement.  If you have anything else for us to consider, please provide.

(Doc. 19-28 at 1.)

On November 21, 2011, Plaintiff's counsel wrote Mr. Bermudez and provided a 2007 cervical MRI record which Plaintiff's counsel asserted he had previously provided, but which Mr. Bermudez reported was missing.  Plaintiff's counsel also provided a CD with the May 2007 and March 2008 cervical spine MRIs, together with an assertion that a "careful comparison of these two studies shows significant neuro-foraminal compromise at C6/C7 on the 2008 study, while such a finding was not present on the May 2007 study" and an assertion that orthopaedic surgeons Grzyb and Monsey had both concluded that "Ms. Gade did in fact suffer significant worsening in her symptoms as a result of the [2008] collision, requiring her to undergo cervical fusion surgery."  (Doc. 97-21 at 1.) Plaintiff's counsel stated that he believed that Plaintiff had four State Farm policies in effect as of January 3, 2008.

Thereafter, on April 18, 2012, Plaintiff's counsel submitted an addendum written by Dr. Mahoney and a March 9, 2012 report letter from Dr. Monsey.  Based on these submissions, Plaintiff's counsel asked State Farm to reconsider its refusal to make a settlement offer on Plaintiff's first-party UM claim.

Dr. Mahoney's April 12, 2012 addendum states:

> Teresa had been treated by me several times in August and September 2007 for an acute, non-traumatic episode of lower back pain.  She had also experienced episodes of neck pain in the past with no report of upper extremity, radiating pain.

This woman would present for treatment at my office occasionally and primarily for flare-ups of chronic lower back pain and muscle spasms. Just before her 1/3/08 motor vehicle accident, I had treated her on 12/18/07. She presented with neck and upper back pain and mild lumbar pain. These symptoms resolved with one visit.

Mrs. Gade returned to my office on 1/15/08 after the January 3, 2008 accident. Her condition at that time included severe neck and upper back pain. By January 28, she started to report right arm and hand pain and paresthesias. On 2/6/08 she was noting pain and parasthesias into both arms and hands. This was clearly a change in any of her previous clinical presentations. Teresa continued to treat with me occasionally until her cervical spine surgery on 9/29/08[.] Her last visit at my office was on August 4, 2008.

It is my opinion that Mrs. Gade's condition and the need for her 9/29/08 spine surgery, more likely than not, was caused by the motor vehicle accident that occurred on 1/3/08.

(Doc. 97-20 at 1.)

Dr. Monsey's March 9, 2012 report letter stated:

Ms[.] Gade initially had atraumatic neck pain in 2007, which resolved with minimal care and had been asymptomatic until 1/2008 when she was in a motor vehicle accident. At that point in time, she began developing neck and arm symptoms again. The motor vehicle accident directly resulted in precipitation of the onset of symptoms related to degenerative changes at C6-7. She underwent a C6-7 anterior diskectomy and fusion with complete relief of her symptoms until 5/2009 when she was struck in a motor vehicle accident again precipitating neck and arm pain secondary to degenerative changes at C5-C6. Because of the ongoing symptoms, she underwent a C5-6 anterior cervical disketomy and fusion with very good relief of her arm symptoms with continued intermittent neck pain at the time I had last seen her in January of 2011.

(Doc. 97-19 at 1.)

On April 27, 2012, Mr. Bermudez wrote Plaintiff's counsel and provided a March 16, 2012 report letter that states as follows:

Thank you for your letter dated April 18th. Enclosed is a report for you to review. I have some concerns on Dr. Mahoney's report stating that [Plaintiff's] issues resolved after the December 18th, 2007 visit[.]

Your client waited 12 days to seek treatment after the accident. There is nothing in the records that support[s] that she was fine after the December

18, 2007 treatment. There were no significant changes in the diagnostics done before and after the accident.

Please review the report [a copy of the March 16, 2012 report by Michael T. Prange, Ph.D., P.E. who opines that the 2008 collision "provided no mechanism to create any cervical spinal disc injuries to [Plaintiff] and provided no more potential for exacerbation of any pre-existing disc pathologies than routine activities.]"

(Doc. 19-31 at 1, 8.)  State Farm concedes it did not rely on the Prange report in its initial denial of Plaintiff's UM claim on August 4, 2011.

### E.    Plaintiff's Bad Faith Claim Against State Farm.

On or about December 31, 2013, Plaintiff filed this lawsuit alleging, among other things, that State Farm acted in bad faith with regard to her 2008 UM claim by: (1) "fail[ing] to respond to Plaintiff's November 21, 2011 request that [State Farm] identify and confirm the auto insurance policies in effect as of January 3, 2008 that afforded [UM] coverage to Plaintiff[;]" and (2) "Defendant's March 18[6] refusal to pay or offer to pay any [UM] benefits to Plaintiff in connection with the January 3, 2008 collision, despite its having neither sought nor obtained any medical opinion or medical report from a licensed medical or health care provider stating that Plaintiff sustained no injury to her cervical spine as a result of that collision[.]"  (Doc. 5 at 5, ¶¶ 41-42.)

In deposition, Mr. Bermudez testified that State Farm concluded that Plaintiff had sustained no injury as a result of the 2008 collision. He further testified that if State Farm had determined that Plaintiff sustained an injury as a result of the 2008 collision, including an aggravation of a preexisting injury or condition or a short-term or transient injury, State Farm would not have denied Plaintiff's claim.  In discovery, State Farm acknowledged that it "does not have a medical opinion from a medical doctor specifically stating that 'Plaintiff sustained no injury to her cervical spine as a result of that [January 3, 2008] collision.'"  (Doc. 97-1 at 39, ¶ 90.)[7]

---

[6] Plaintiff characterizes this as a typographical error in her Complaint and contends that she meant to indicate August 4, 2011.

[7] Plaintiff proffers evidence which she claims reveals that State Farm's activity log for her 2008 collision claim is either inadequate or inaccurate and asks the court to accept as an undisputed

### F.     Plaintiff's Proffered Expert Witness's Opinion.

In support of her opposition to State Farm's motion for partial summary judgment, Plaintiff submits the twenty-six page report (the "Fey Expert Report") of Louis G. Fey, Jr. dated August 11, 2015.[8]  (Doc. 97-30.)  In his Expert Report, Mr. Fey stated that he provided his opinions "with a reasonable degree of probability based upon the standards that apply to the property casualty insurance industry." *Id.* at 2.  Based upon his review of Plaintiff's insurance policies and medical records, State Farm's claim file, related correspondence, and the legal documents filed in this case, Mr. Fey asserts that State Farm "failed to conduct a prompt and thorough investigation in violation of industry standards before denying the claim[,]" and "handled the claim with a preconceived bias against its insured in violation of industry standards[.]" *Id.* at 24.  Mr. Fey notes that State Farm recognized that Plaintiff was likely an "eggshell plaintiff" and contends that "[t]he industry acknowledges that pre-existing conditions actually increase a claim[']s value rather than lowering it." *Id.* at 20.  He thus concludes that "from an objective claims perspective, there was no reasonable basis upon which [State Farm] could conclude that [Plaintiff] did not suffer[] some injury or ex[ac]erbation of her pre-existing condition as a result of the January 3, 2008 hit-and-run collision." *Id.* at 11.

---

fact that "State Farm has a well-recognized history of a widespread pattern of bad-faith insurance practices in denying and refusing to pay any benefits on automobile claims" and "a history of concealing and destroying relevant claims file records and claims handling manuals and policies" citing one case and an article.  (Doc. 97-1 at 42-43.)  Because the alleged facts are not relevant in determining the pending motions, the court disregards them.

[8] Mr. Fey has "been engaged to serve as an expert witness with regard to the industry standards, customs, and practice involved in handling uninsured motorist ("UM") insurance claims." (Doc. 97-30 at 2.)  He has over thirty-three years of experience handling insurance claims, including auto claims and related litigation.  In his role at Fey Consulting LLC, he "provide[s] litigation support and or expert testimony with regard to claim handling, allegations of agency errors and omissions, underwriting disputes, and a variety of other insurance[-]related issues." *Id.* Previously, Mr. Fey has been qualified as an expert on insurance matters by courts in Georgia, Mississippi, and Louisiana.

## II.   Conclusions of Law and Analysis.

### A.   Standard of Review.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "When viewing the evidence, the court must 'assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in [the non-movant's] favor.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir. 1990)).   Summary judgment is warranted if the non-moving party fails to proffer admissible evidence in support of each essential element of her claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). However, "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

Although Plaintiff contends that she was not "afforded adequate discovery even on the limited issue of the 'first prong' of Vermont's bad faith law," (Doc. 97 at 8 n.8), pursuant to Fed. R. Civ. P. 56(d), the court granted her an extension of thirteen months to file her opposition to State Farm's motion for partial summary judgment.   During this time, Plaintiff propounded interrogatories and document requests, deposed State Farm's claim representative with regard to her 2008 UM claim, underwent an independent medical examination ("IME"), and retained an expert witness who produced an expert

report. The court thus concludes that Plaintiff had adequate time for discovery prior to filing her opposition.[9]

Because the court's jurisdiction over this case is based upon diversity of citizenship, it analyzes Plaintiff's bad faith claim in accordance with Vermont law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005). The court applies the Federal Rules of Evidence, in conjunction with Vermont's substantive law, in order to determine the admissibility of any contested evidence. *See Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 876-83 (10th Cir. 2006) (joining other Circuits that have held that Federal Rules of Evidence are not governed by *Erie* doctrine in a diversity case, but noting that courts must still consider that "state substantive policy directs the admissibility of evidence under the relevancy considerations of Rule 401").

### B. Vermont Law Governing First-Party Bad Faith.

Under Vermont law, "[t]o establish bad faith, the plaintiff must show that: '(1) the insurance company had no reasonable basis to deny benefits of the policy, and (2) the company knew or recklessly disregarded the fact that no reasonable basis existed for denying the claim.'" *Murphy v. Patriot Ins. Co.*, 2014 VT 96, ¶ 17, 106 A.3d 911, 917 (quoting *Bushey v. Allstate Ins. Co.*, 670 A.2d 807, 809 (Vt. 1995)). "An insurance company may challenge claims that are fairly debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis." *Bushey*, 670 A.2d at 809 (internal quotation marks omitted). "Thus,

---

[9] *See Serecky v. Nat'l Grange Mut. Ins.*, 2004 VT 63, ¶ 28, 857 A.2d 775, 785, 177 Vt. 58, 69-70 ("[W]e also reject plaintiffs' assertion that the court erred in granting summary judgment before discovery was complete" and noting that, despite plaintiffs' claim that with additional discovery "they might have been able to show that defendants acted in bad faith by denying coverage without conducting a proper investigation[,] . . . we find no error in the timing of the court's summary judgment decision."); *Bushey v. Allstate Ins. Co.*, 670 A.2d at 811 (Vt. 1995) (rejecting plaintiff's argument "that the court should not have granted defendant's summary judgment motion when the parties had not completed discovery [because] further discovery might have provided relevant information, including in-house memoranda that defendant had been ordered to produce" and observing that "Rule 56 does not require that summary judgment motion decisions await completion of discovery, and to so require would defeat the purpose of the rule.").

the rule limits recovery to instances in which an insurer not only errs in denying coverage but does so unreasonably." *Id.* As a result, under Vermont law, "no insurer will be liable for a good-faith error in denying or delaying a claim," *id.*, and "[w]here a claim is 'fairly debatable,' the insurer is not guilty of bad faith even if it is ultimately determined to have been mistaken." *Murphy*, 2014 VT 96, ¶ 17 (quoting *Bushey*, 670 A.2d at 809).

As a threshold issue, the parties dispute whether the first prong of the bad faith test presents a question of law or a question of fact.[10] The Vermont Supreme Court arguably has not squarely addressed this issue. In such circumstances, this court must predict how that court would rule. As the Second Circuit has explained:

> our role as a federal court sitting in diversity is not to adopt innovative theories that may distort established state law. Instead we must carefully predict how the state's highest court would resolve the uncertainties that we have identified. In making this prediction, we give the fullest weight to pronouncements of the state's highest court . . . while giving proper regard to relevant rulings of the state's lower courts.

*Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009).

---

[10] Plaintiff contends that whether State Farm had a reasonable basis to deny her claim is a question of fact under Vermont law. The cases she cites for this contention are either distinguishable or stand for a contrary proposition. In *Century Partners, LP v. Lesser Goldsmith Enterprises, Limited*, 2008 VT 40, 184 Vt. 215, 958 A.2d 627, the court considered good faith in the context of a landlord-tenant contract, pursuant to a different standard than a first-party bad faith insurance claim. *Id.* at ¶ 21. *Buote v. Verizon New Eng.*, 249 F. Supp. 2d 422, 432 (D. Vt. 2003), involved a worker's compensation case which posed the question of whether an injury was work-related and included "strong evidence that the claims adjuster's stated basis for denying benefits was a misrepresentation[.]" This court concluded that those factual issues must be resolved by the jury. *Id.* In *Village of Morrisville Water Light Department v. United States Fidelity & Guaranty Co.*, 775 F. Supp. 718, 735 (D. Vt. 1991), this court considered whether an insurer "acts in bad faith in refusing to defend its insured" and concluded that the issue was "generally one for the trier of fact" but noted that the issue "becomes a question of law . . . from the uncontroverted evidence in the record. Such is not the case here." (internal citation omitted). In *Myers v. Ambassador Insurance Co.*, 508 A.2d 689, 690 (Vt. 1986), which predates *Bushey*, the Vermont Supreme Court addressed whether an "insurer acted in bad faith as a matter of law by refusing to settle [an] underlying lawsuit within the limit of [the insured's] policy and by not advising him of matters critical to his exposure, thereby depriving him of the opportunity to protect his uninsured interests." *Id.* The *Myers* court concluded that "it is clear that the insurer acted in bad faith as a matter of law." *Id.* at 692.

Here, the court predicts that the Vermont Supreme Court would rule that where the facts are undisputed, the court may rule on the first prong of the bad faith test as a question of law. Indeed, *Bushey* makes this point clear:

> [a] motion for summary judgment by an insurer compels a court to consider both elements of the bad-faith tort. If the insurer prevails on either prong, the court must grant the insurer's motion. . . . When a court decides that an insurer's actions were reasonable because the claim was *fairly debatable as a matter of law, it must grant the summary judgment motion* without reaching the question of the insurer's knowledge.

*Bushey*, 670 A.2d at 810 (emphasis supplied). In so ruling, the *Bushey* court cited with approval *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 873 (5th Cir. 1991), for the proposition that "whether [an] insurer had [an] arguable reason to deny [an] insured's claim was [an] issue of law for [the] court[.]" *Bushey*, 670 A.2d at 810.

Likewise, in *Murphy*, the Vermont Supreme Court affirmed the trial court's determination of the issue of bad faith as a matter of law. *Murphy*, 2014 VT 96, at ¶¶ 8, 18 (affirming trial court's grant of summary judgment where the insurer "had a reasonable, if debatable, basis to deny [p]laintiff's claims under the policy" and noting that "[m]easured against our bad faith standard, we find no basis to disturb the trial court's ruling"). In doing so, the Vermont Supreme Court was aware that the Vermont trial court had unequivocally treated the first prong of the bad faith test as a question of law. *See Murphy v. Patriot Ins. Co.*, 2012 WL 9092654, at *7 (Vt. Sup. Ct. June 22, 2012) ("Whether an insurer has an arguable reason to deny an insured's claim is an issue of law for the court to decide.").

Similarly, in *Serecky v. National Grange Mutual Insurance*, 2004 VT 63, 177 Vt. 58, 857 A.2d 775, the Vermont Supreme Court addressed whether the trial court erred in "rejecting plaintiffs' claim of bad faith as a matter of law" and concluded that it did not, noting that its decision in *Myers v. Ambassador Insurance Co.*, 508 A.2d 689 (Vt. 1986) held that the "determination of whether [an] insurer acted in bad faith presents a question of law where, based on uncontroverted evidence, a 'reasonable man following the law

can draw but one conclusion on the issue[.]'" *Serecky*, 2004 VT 63, at ¶¶ 11, 27 (quoting *Myers*, 508 A.2d at 692).

In light of the foregoing, this court has no difficulty in predicting that the Vermont Supreme Court would hold that, where the material facts are uncontroverted, the first prong of the bad faith test presents a question of law for the court. Summary judgment therefore may be granted even where, as here, the parties differ as to the import of the facts:

> The genuine issue rule in the context of bad faith claims allows a district court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability[.]

*Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002).

Having determined that State Farm's request for partial summary judgment on the first prong of the bad faith test presents a question of law for the court, the court turns to whether Plaintiff's proffered expert witness's opinions on that question are admissible.

### C.   Whether Mr. Fey's Expert Witness Opinions are Admissible.

In opposing summary judgment, Plaintiff proffers the Fey Expert Report and asserts it creates a question of fact regarding whether State Farm acted in bad faith. Although Mr. Fey couches many of his opinions in terms of whether State Farm has violated industry standards, he also opines, among other things, that State Farm "cannot be deemed to have had, as of August 4, 2011 or November 18, 2011, a reasonable basis to completely reject Gade's claim" and State Farm's "decision to reject the claim outright, and its refusal to offer one penny, was not reasonable[.]" (Doc. 98-1 at 22.)

State Farm has moved *in limine* with regard to the Fey Expert Report, arguing that Mr. Fey's opinions are inadmissible as to whether State Farm had a reasonable basis to deny Plaintiff's 2008 UM claim because they constitute legal conclusions. It points to two federal district courts that have specifically rejected Mr. Fey's opinions on that basis. *See Versai Mgmt. Corp. v. Landmark Am. Ins. Corp.*, 2013 WL 681902, at *3 (E.D. La. Feb. 22, 2013) ("Fey will not be permitted to testify regarding whether Defendant's

conduct rises to the level of bad faith . . . because such opinions are legal conclusions" and noting that although "Fey may testify about insurance industry standards, . . . he may not . . . render ultimate legal conclusions that Defendant acted in bad faith"); *SJB Grp., LLC v. TBE Grp., Inc.*, 2013 WL 4499032, at *3 (M.D. La. Aug. 19, 2013) (excluding Mr. Fey's opinions regarding the proper interpretation of an insurance contract because to "allow an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant") (internal quotation marks omitted).

In the Second Circuit, it is well-established that an expert witness may not provide testimony that constitutes a legal conclusion. *See Densberger v. United Techs. Corp.*, 297 F.3d 66, 74 (2d Cir. 2002) (reiterating the "well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions"); *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (holding "expert testimony . . . that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it . . . by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach") (internal citation, alteration, and quotation marks omitted); *United States v. Scop*, 846 F.2d 135, 139-40 (2d Cir. 1988) ("Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions" because such opinions "invade the province of the court" and are inadmissible) (internal quotation marks omitted); *see also In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (collecting cases and concluding that "every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law"). This rule applies not only to summary judgment motions decided by the court, but also to testimony presented to a jury. *See Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977), *cert. denied*, 434 U.S. 861 (1977) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge."); *see also Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes with equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the

22

relevant legal standards."). Accordingly, to the extent Mr. Fey offers opinions regarding whether State Farm had a reasonable basis to deny Plaintiff's claim, he invades the court's province by testifying on a question of law. Such opinions are inadmissible. *See Densberger*, 297 F.3d at 74.

Mr. Fey's opinions regarding State Farm's alleged errors in processing Plaintiff's claim are inadmissible for a different reason. In order to determine whether a claim is fairly debatable as a matter of law, the court need not consider industry standards, or determine whether State Farm's processing of Plaintiff's claim was sufficient or consistent with those standards, or whether State Farm violated its own internal standards, protocols, or policies. The Vermont Supreme Court has never held that these external standards must be considered in evaluating the first prong of a bad faith claim.[11] Mr. Fey's opinions regarding certain insurance industry standards, while perhaps admissible with regard to the second prong of the bad faith test, therefore have no relevance with regard to whether Plaintiff has satisfied the first prong. *See Smith v. Allstate Ins. Co.*, 912 F. Supp. 2d 242, 251-52 (W.D. Pa. 2012) (granting motion *in limine* to exclude expert witness testimony that included opinions regarding compliance with insurance company's internal policies, insurance industry standards, and whether insurance company and its employees handled UIM claim in bad faith because the "overwhelming majority of the information and opinions contained in [the expert's] report are outside the permissible scope of expert testimony").

A claim that is fairly debatable does not lose that status simply because an adjuster failed to adhere to insurance industry or internal standards in denying the claim. Rather, a claim, is fairly debatable where an insurer had a reasonable, if debatable, basis to deny a plaintiff's claim even if that reasonable basis is later proved incorrect. *Murphy*, 2014 VT 96, at ¶ 8. In Vermont, this determination is made based on the facts known to the

---

[11] Indeed, as more fully addressed below, the Vermont Supreme Court has specifically rejected a cause of action for negligent processing of an insurance claim. *See Murphy*, 2014 VT 96, at ¶¶ 11-16.

insurer at the time, not on whether the insurer has complied with industry or internal standards. *Id.*

Because Mr. Fey's opinions are either conclusions of law reserved for the court or irrelevant opinions regarding claims processing standards, they are inadmissible for purposes of the pending motion. State Farm's Motion In Limine Re: Plaintiff's Proffered Bad Faith Expert Witness (Doc. 98) is therefore GRANTED.

### D.    Whether the Prange Opinion is Admissible.

Plaintiff contends that because State Farm received the Prange report after it denied Plaintiff's 2008 UM claim on August 4, 2011 and November 18, 2011, it cannot be deemed to be something State Farm considered in the context of processing Plaintiff's 2008 UM claim. *See* 14 Couch on Ins. § 207:6 (3d ed. 2015) ("The test to be applied in judging the insurer's conduct is the action of a reasonable person under the circumstances which existed at the time the insurer refused payment.").

Courts have reached divergent conclusions regarding whether the opinion of a biomechanical engineer is admissible at trial and for what purpose. The more recent trend is to allow such opinions as a form of accident reconstruction provided that the biomechanical expert does not testify regarding whether a specific accident caused or contributed to a plaintiff's injuries.[12]

---

[12] *See, e.g., Laski v. Bellwood*, 2000 WL 712502, at *3 (6th Cir. May 25, 2000) ("[B]iomechanics are qualified to determine what injury causation forces are in general and can tell how a hypothetical person's body will respond to those forces, but are not qualified to render medical opinions regarding the precise cause of a specific injury.") (internal quotation marks omitted); *Boykin v. W. EJCPress, Inc.*, 2015 WL 539423, at *6, *9 (S.D.N.Y. Feb. 6, 2015) (denying motion *in limine* to bar expert witness's biomechanical analysis that opined that "forces acting on Plaintiff's body were below injury thresholds and comparable to those experienced during 'routine daily activities[]'" and noting that "[c]ourts in other jurisdictions have admitted accident reconstruction and biomechanics expert testimony based on evidence comparable to what [expert witness] relied on here"); *Rodriguez v. Athenium House Corp.*, 2013 WL 796321, at *4-5 (S.D.N.Y. Mar. 5, 2013) (ruling biomechanical engineer may testify "about the nature and amount of force generated by the accident in question and the observed effect of that force on a human body in comparable accidents[,]" but is not qualified to offer a medical opinion as to whether a specific accident caused plaintiff's injuries) (internal quotation marks omitted); *Smith v. BNSF Ry. Co.*, 2011 WL 7053631, at *5 (W.D. Okla. Sept. 14, 2011) ("In general,

In this case, the parties began discussing Plaintiff's 2008 UM claim in October of 2010. State Farm first consulted with Mr. Prange in August of 2011 but did not receive his report until March 2012. State Farm concedes that it did not rely on the Prange report when it initially denied Plaintiff's claim on August 4, 2011. Thereafter, however, State Farm continued to communicate with Plaintiff's counsel regarding Plaintiff's 2008 UM claim, including inviting Plaintiff to submit additional information. On April 27, 2012, State Farm wrote to Plaintiff's counsel, forwarded the Prange report, and asked Plaintiff's counsel to review it. In doing so, State Farm cited Mr. Prange's conclusion that the 2008 collision "provided no mechanism to create any cervical spinal disc injuries to [Plaintiff] and provided no more potential for exacerbation of any pre-existing disc pathologies than routine activities." (Doc. 19-31 at 8.) Plaintiff filed suit approximately eight months later on December 31, 2012.

Based upon the undisputed facts, the Prange report is admissible for the limited purpose of demonstrating that, pre-lawsuit, State Farm consulted with an expert witness in the course of analyzing Plaintiff's 2008 UM claim.[13] It is also undisputed that State Farm relied on the Prange report to buttress its August 2011 conclusion that there were "causation issues regarding the injuries alleged in this matter" and "[b]ecause the impact was so minor, we feel that this accident did not aggravate [Plaintiff's] condition[.]" (Doc. 19-24 at 1.)

---

biomechanical engineers are qualified to offer expert opinion and that opinion may include causation so long as a medical opinion is not offered").

[13] *See Keshish v. Allstate Ins. Co.*, 959 F. Supp. 2d 1226, 1233 (C.D. Cal. 2013) ("An insurer may demonstrate the existence of a genuine dispute by showing that 'it relied on opinions from experts while evaluating the insured's claim.'") (quoting *Maynard v. State Farm Mut. Auto. Ins. Co.*, 499 F. Supp. 2d 1154, 1160 (C.D. Cal. 2007)); *United Servs. Auto. Ass'n v. Croft*, 175 S.W.3d 457, 469 (Tex. Ct. App. 2005) ("[A]n insurer's reliance on an expert's report will not support a finding of bad faith unless it is shown 'the report was not objectively prepared or the insurer's reliance on the report was unreasonable.'") (quoting *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997)).

**E.      Whether State Farm Had a Reasonable Basis to Deny Plaintiff's 2008 UM Claim.**

State Farm argues that it is entitled to judgment as a matter of law because it had a reasonable basis to deny Plaintiff's 2008 UM claim.  Plaintiff counters that State Farm's refusal to make a settlement offer is indicative of its bad faith because there is no dispute that the 2008 collision took place and she has two medical opinions indicating that her injuries from that collision required spinal surgery.  Plaintiff points to various aspects of her medical records, which she argues State Farm misinterprets, and asserts that the 2008 collision exacerbated her pre-existing condition.  As an "eggshell plaintiff," she asserts that a reasonable insurer would recognize that she was entitled to some payment on her 2008 UM claim.

Plaintiff's arguments are primarily directed to perceived inadequacies in State Farm's investigation of her 2008 UM claim. *See, e.g.*, Doc. 97 at 7 ("State Farm did not obtain an IME.  According to State Farm, despite its repeated representations that it was obtaining an independent physician review of the records, it did not obtain a records review.").  These arguments are generally misplaced in analyzing the first prong of a bad faith claim.  An insurance company has no obligation to perform a flawless investigation or exercise perfect judgment in order to defeat a bad faith claim. *See Murphy*, 2014 VT 96, at ¶¶ 11-16 (rejecting proposition that a bad faith claim may be predicated on a negligent or inadequate investigation); *Bushey*, 670 A.2d at 809 ("[N]o insurer will be liable for a good-faith error in denying or delaying a claim"); *see also Adam v. Stonebridge Life Ins. Co.*, 612 F.3d 967, 975 (8th Cir. 2010) ("Where an insurer has an objectively reasonable basis to deny coverage, it has no duty to investigate further before denying the claim") (internal quotation marks omitted); *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 520 (Ind. 1993) (holding that "the lack of diligent investigation alone is not sufficient to support [a bad faith] award").

An insurer is also not required to accept an insured's own statements regarding causation or even those of her treating physicians provided there is a reasonable basis to doubt their reliability.  In *Bushey*, the Vermont Supreme Court addressed this very issue:

26

Plaintiff emphasizes evidence he calls 'voluminous,' indicating that, whether or not the extent of his injuries was clear from the outset, by August 1991 defendant was aware that both of plaintiff's surgeons, who had been treating him for approximately one year and had performed surgery on him, were of the opinion that the shoulder injury resulted from the accident. The evidence, however, supports the judgment that there was a valid reason for an independent medical examination by defendant, whose expert reported that he was unable to discern a clear cause-and-effect relationship between the auto accident and the rotator cuff tear, and a fair dispute about the amount of plaintiff's damages. The court properly concluded that plaintiff's claim was fairly debatable as a matter of law. Consequently, there was no occasion for the court to consider defendant's possible bad faith.

*Bushey*, 670 A.2d at 810-11.

In this case, although Dr. Mahoney and Dr. Monsey supported Plaintiff's position with regard to causation, State Farm had a valid basis to doubt the credibility of those opinions and Plaintiff's Statement Under Oath because all three asserted that Plaintiff's neck and back pain were no longer problematic prior to the 2008 collision.[14] The undisputed facts, however, reveal that Plaintiff had a significant history of neck and back pain, including two associated surgeries, and that she continued to be symptomatic prior to the 2008 collision.

At the scene of the 2008 collision, although Plaintiff complained of a sore neck, she did not go to the hospital or otherwise seek medical treatment until twelve days later. When she sought treatment from her chiropractor, she did not mention the 2008 collision until her third visit after the accident. Subsequent efforts to confirm her belief that the 2008 collision exacerbated her pre-existing condition yielded mixed results. Two of her

---

[14] For example, Dr. Monsey opined that Plaintiff "had atraumatic neck pain in 2007, which resolved with minimal care and had been asymptomatic until 1/2008 when she was in a motor vehicle accident" (Doc. 97-19 at 1), when in fact in the years preceding the 2008 collision, Plaintiff had reported to her medical treatment providers "neck pain that is fairly constant" (Doc. 19-10 at 1), "cervical spine discomfort for at least the last twelve months[,]" and occasional numbness in her fingers of each hand. (Doc. 97-3 at 1.) Just weeks prior to the 2008 collision, she reported "continued neck and dorsal pain which is frequent and ranging from 4-6 on 10 scale" and "neck and upper back pain and stiffness and extreme limitation of cervical motion[.]" (Doc. 97-5 at 2-3.)

treating physicians advised her that her MRIs before and after the 2008 collision revealed no significant changes.

Moreover, although Plaintiff asserts that her potential status as an "eggshell plaintiff" inexorably required State Farm to conclude that the 2008 collision exacerbated her pre-existing condition, State Farm had a reasonable basis to conclude otherwise. First, Plaintiff was simultaneously asserting that her pre-existing condition had fully resolved prior to the 2008 collision. And second, as State Farm pointed out, the 2008 collision produced only a minor impact when Plaintiff's stationary vehicle was hit from behind by a vehicle which she told Dr. Zweber was "going perhaps 10 mile[s] per hour." (Doc. 97-7 at 1.) At the time, Plaintiff was wearing both a shoulder and lap belt. The 2008 collision required repair, not replacement, of Plaintiff's bumper; property damage that Plaintiff declined to repair even though there was no deductible associated with it.

On January 4, 2008, the day after the 2008 collision, Plaintiff reported a UM claim for only property damage to State Farm. Although she faults State Farm for not affirmatively telling her that UM coverage was available for personal injuries, State Farm was entitled to consider the fact that Plaintiff did not submit a claim for personal injury arising out of the 2008 collision until October 5, 2010 when she sought insurance benefits as a result of her 2009 collision. *See Ardoin v. Firestone Polymers, L.L.C.*, 2010-0245, p.10-11 (La. 1/19/11), 56 So. 3d 215, 222 ("While not every delay in reporting an accident necessarily discredits or casts serious doubt on the [plaintiff's] account of the accident, we conclude the particular circumstances surrounding the failure to report the alleged . . . accident in this case do indeed discredit or cast serious doubt on the plaintiff's claim[.]"). Based upon the undisputed facts known to it at the time, State Farm had a reasonable basis to question whether Plaintiff's claimed injuries were caused by the 2008 collision. In such circumstances, a bad faith claim must fail. *See Bushey*, 670 A.2d at 810; *see also Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005) ("[I]f reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable.").

Plaintiff gains no further ground by arguing that State Farm was required to make *some form* of settlement offer because State Farm's representative conceded in deposition that State Farm was obligated to pay a UM claim for which Plaintiff suffered *any* injury. While an insurer may have an obligation to pay that portion of a claim which is uncontested, Plaintiff's entire 2008 UM claim was contested with the exception of the $333.40 in property damage, which Plaintiff decided not to repair. Plaintiff submitted medical bills in the amount of $51,249.48 and lost wages in the amount of $51,249.48 as evidence of damages she incurred as a result of the 2008 collision and demanded State Farm pay the UM policy limits. This demand, which Plaintiff never reduced, prompted "a fair dispute about the amount of plaintiff's damages." *Bushey*, 670 A.2d at 810 (concluding on claim of bad faith that insurer was entitled to summary judgment where claims for medical payments were "fairly debatable") (citing *Wilson v. State Farm Mut. Auto Ins. Co.*, 795 F. Supp. 1077, 1081 (D. Wyo. 1992)); *see also Sullivan v. Allstate Ins. Co.*, 2010 WL 3323726, at *9 (D. Vt. Aug. 3, 2010) (granting summary judgment in favor of insurer on first prong of bad faith claim where "throughout the adjustment process, there was a significant and legitimate debate regarding the value of [the plaintiff's underinsured motorist] claim"). In such circumstances, State Farm was not required to make any settlement offer on a fully contested claim. As the *Bushey* court explained: "Thus, if a realistic question of liability exists, an insurer *may withhold payment* while it determines whether there is a reasonable basis for the claim or the amount demanded." *Bushey*, 670 A.2d at 810 (emphasis supplied); *see also Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1275 (Fla. 2000) ("[T]he denial of payment does not mean an insurer is guilty of bad faith as a matter of law. The insurer has a right to deny claims that it in good faith believes are not owed on a policy.").

Finally, courts in other jurisdictions have held that if an insured could not obtain summary judgment or a directed verdict on his or her underlying contract claim for insurance benefits, the claim is, by definition, "fairly debatable." *See, e.g., Oliver v. M/V BARBARY COAST*, 901 F. Supp. 2d 1340, 1348 (S.D. Ala. 2012) ("Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the

claim and, thus, the legitimacy of the denial thereof, the ['normal' bad faith] claim must fail and should not be submitted to the jury[.]") (quoting *Mut. Serv. Cas. Ins. Co. v. Henderson*, 368 F.3d 1309, 1314 (11th Cir. 2004)) (emphasis omitted); *Badiali v. N.J. Mfrs. Ins. Grp.*, 107 A.3d 1281, 1288 (N.J. 2015) ("[A] claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad faith refusal to pay the claim.") (quoting *Pickett v. Lloyd's*, 621 A.2d 445, 454 (N.J. 1993)). Although the Vermont Supreme Court has not required a plaintiff to establish that he or she could prevail on the underlying contract claim in order to establish the first prong of a bad faith claim, in *Bushey*, it cited with approval the Fifth Circuit's opinion in *Dunn* that "because [the] insured would not have been entitled to [a] directed verdict on [the] contract claim, [the] insurer clearly had [an] arguable reason[] to deny [the] claim[.]" *Bushey*, 670 A.2d at 810 (citing *Dunn*, 927 F.2d at 873). In the instant case, there can be no doubt that Plaintiff is unable to establish, as a matter of law, that she is entitled to the policy limits for her 2008 UM claim.

Having determined that Plaintiff cannot establish the first prong of her bad faith claim, the court proceeds no further and does not reach the issue of State Farm's knowledge. *See id.* (holding that "[i]f the insurer prevails on either prong, the court must grant the insurer's motion" and if the court decides the motion on the first prong of the bad faith test it "must grant the summary judgment motion without reaching the question of the insurer's knowledge."). For the reasons stated above, State Farm's Motion for Partial Summary Judgment (Doc. 19) is GRANTED.

### F.     Whether State Farm May be Liable for Bad Faith Processing of Plaintiff's 2008 UM Claim.

In her Complaint, Plaintiff alleges that State Farm acted in bad faith by allegedly failing "to respond to Plaintiff's November 21, 2011 request that it identify and confirm the auto insurance policies in effect as of January 3, 2008 that afforded [UM] insurance coverage to Plaintiff[.]" (Doc. 5 at 5, ¶ 41.) Although 23 V.S.A. § 941(g) requires

insurers to provide information regarding the scope of available coverage,[15] it does not create a private cause of action for failing to do so. There is also no private cause of action under the Insurance Trade Practices Act, 8 V.S.A. § 4734. *See Wilder v. Aetna Life & Cas. Ins. Co.*, 433 A.2d 309, 310 (Vt. 1981). Assuming *arguendo* that State Farm unreasonably delayed the provision of UM coverage information to Plaintiff when she requested State Farm confirm such coverage more than two years after the 2008 collision,[16] any such delay would not give rise to a claim of bad faith under Vermont law.

In *Murphy*, the Vermont Supreme Court extended its holding in *Hamill v. Pawtucket Mutual Insurance Co.*, 2005 VT 133, ¶¶ 2-3, 179 Vt. 250, 252, 892 A.2d 226, 227, and specifically rejected the proposition that a plaintiff may bring a claim sounding in negligence against his or her insurer for improperly processing a claim. *Murphy*, 2014 VT 96, at ¶¶ 11-16. The court noted that "[t]he bad faith remedy would generally be superfluous if mere negligence in handling a claim would be sufficient for liability[,]" and joined "most other courts [that] have limited actions by insureds against their insurers to breach of contract or the implied covenant of good faith and fair dealing and have disallowed actions for negligence based upon an independent duty of care." *Id.* at ¶¶ 13-14. There is thus no cause of action under Vermont law for bad faith processing of a claim outside the Vermont Supreme Court's two-prong bad faith test. As the Vermont Supreme Court has observed, "[s]uch a claim would fall well short of the knowing or reckless conduct required for a finding of bad faith." *Id.* at ¶ 24.[17]  Plaintiff's bad faith

---

[15] 23 V.S.A. § 941(g) states that an insurer "[w]ithin 30 days of receipt of a written request by a person reasonably claiming the right to recover damages after an accident . . . under a [UM] policy . . . shall provide a statement, by a duly authorized agent of the insurer, setting forth the names of the insurer and insured, and the limits of liability coverage."

[16] The undisputed facts reveal that State Farm provided Plaintiff with information regarding the scope of her UM coverage in a sufficiently timely manner to permit Plaintiff to submit and pursue a claim thereunder.

[17] In making this observation, the *Murphy* court cited with approval *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 108 Cal. Rptr. 2d 776, 787 (Cal. Ct. App. 2001) ("Sloppy or negligent claims handling does not rise to the level of bad faith"); *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 520 (Ind. 1993) (observing that "the lack of diligent investigation alone is not sufficient to support an award" for bad faith); *Sampson v. Am.*

claim arising out of State Farm's processing of her 2008 UM claim is therefore DISMISSED.

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendant State Farm's Motion for Partial Summary Judgment (Doc. 19) and GRANTS State Farm's Motion In Limine Re: Plaintiff's Proffered Bad Faith Expert Witness (Doc. 98).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _19th_ day of November, 2015.

Christina Reiss, Chief Judge
United States District Court

---

*Standard Ins. Co.*, 582 N.W.2d 146, 152 (Iowa 1998) ("In a first-party bad faith claim, an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim") (internal quotation marks omitted); and 14 Couch on Ins. § 207:25 (noting that proof of an "imperfect investigation" is not sufficient basis for bad faith recovery).